UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HAMILTON MEMORIAL HOSPITAL DISTRICT, an Illinois governmental Municipality, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Cause No. 3:12-cv-01004-JPG-PMF |
| | ) |
| APRIL TOELLE and DEACONESS HOSPITAL, INC. | ) ) ) |
| Defendants. | ) ) |

## BRIEF IN SUPPORT OF DEACONESS HOSPITAL, INC.'S
## MOTION FOR SUMMARY JUDGMENT

Comes now Defendant, Deaconess Hospital, Inc., and in support of its Motion for Summary Judgment filed herewith, states as follows:

## STATEMENT OF POSITION

April Toelle ("Dr. Toelle") graduated from the Deaconess Hospital Physician Residency Program in June, 2010. Thereafter, she took a job with Hamilton Memorial Hospital ("HMH") in McLeansboro, Illinois where she practiced Family Medicine. For a number of reasons, including HMH's breach of her employment agreement, Dr. Toelle became very unhappy at Hamilton Memorial. As a result, she contacted Deaconess Hospital, Inc. ("Deaconess") about possible job opportunities. As a matter of practice, Deaconess does not contact physicians about employment unless they first express an interest in Deaconess. Ultimately, Dr. Toelle was hired by Deaconess as a Hospitalist – a job she holds to this day.

On these facts, HMH accuses Deaconess of tortiously interfering with its employment agreement with Dr. Toelle. However, Deaconess hired Dr. Toelle only

after she contacted Deaconess about employment opportunities and then only after she told Deaconess she had decided to resign from Hamilton Memorial with advice from her lawyer.

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

HMH is an Illinois government municipality with its principal place of business in Hamilton County, Illinois.  (Complaint ¶ 2) [Doc. 2].  Dr. Toelle is an Indiana resident. (Id. at ¶ 3).  Deaconess is an Indiana corporation with its principal place of business in Evansville, Indiana.  (Id. at ¶ 4).  Despite this lawsuit, HMH and Deaconess have enjoyed a mutually beneficial relationship.  (Dauby Dep. p. 79, which is attached hereto as Ex. A).

1.    <u>**Dr. Toelle's Employment at HMH**</u>.

From 2007 to 2010, Deaconess employed Dr. Toelle as a resident physician while she attended the Deaconess residency program.  (Toelle Dep. p. 19-20, which is attached hereto as Exhibit B). On December 4, 2009, Dr. Toelle signed a "Physician Employment Agreement" (the "HMH Agreement"), under which she agreed to work for HMH as a family practice physician from August 16, 2010, until August 15, 2013.  (Ex. C; Toelle Dep. p. 72).  In drafting the HMH Agreement, HMH reserved the unilateral right to terminate its employment relationship with Dr. Toelle for any reason but did not include any provision extending the same right to Dr. Toelle.  (Ex. C; Toelle Dep. p. 29-30; Dauby Dep. p. 137, 332).

At the same time HMH recruited Dr. Toelle, it also recruited Dr. "Alex" Alvarez ("Dr. Alvarez"), from the Deaconess Residency Program, who also signed an identical employment agreement with HMH. (Toelle Dep. p. 31-32; Dauby Dep. p. 295).

While working at HMH, Dr. Toelle became unhappy about several issues, including, but not necessarily limited to, (1) the lack of respect shown to her by HMH as a young physician; (2) HMH's misrepresentation about the time she would have to spend attending to patients of other physicians; (3) inappropriate questioning by HMH's CEO about her plans to have children; (4) HMH's failure to properly pay her for supervising nurse practitioners pursuant to the HMH Agreement; (5) HMH's failure to timely pay her an efficiency bonus; and (6) HMH's failure to abide by its promise to modify its incentive pay system to allow Drs. Toelle and Alavarez a reasonable opportunity to earn additional pay.  (Toelle Dep. p. 23, 54-56, 75, 81, 126-129, 152-156).

### a. <u>HMH's Breach of the HMH Agreement</u>

In order to retain its designation as a federal Rural Health Clinic, which allows it to receive higher levels of reimbursement from Medicaid/Medicare, HMH is required to employ nurse practitioners.   (Dauby Dep. p. 345, 358, 403-404).   These nurse practitioners must be supervised by physicians under what is commonly known in healthcare law as a "Collaborative Agreement" between the physician and nurse practitioner. (Id.).  In August 2011, Nurse Practitioners Sharon Atwell and Tara Vogel began working at HMH. (Atwell Dep. p. 7, 23, which is attached hereto as Exhibit D; Vogel Dep. p. 11, 18, which is attached hereto as Exhibit E).  There is no dispute that Dr. Toelle supervised both Atwell and Vogel. (Dauby Dep. p. 337; Atwell Dep. p. 22, 25, 45-46; Vogel Dep. p. 37-39; Alvarez Dep. p. 110-111, which is attached hereto as Exhibit F).

Paragraph 5.5 of the HMH Agreement clearly sets forth the compensation Dr. Toelle should have received for her supervision of nurse practitioners:

**5.5 <u>Supervisor</u>**. Physician shall be paid $500 per month for each nurse practitioner or physician assistant supervised by Physician in a primary supervision role. Supervision shall include both quality and quantity of the nurse practitioner's or physician assistant's work. . . .   Hospital has the final decision as to which physician is the supervising physician for each nurse practitioner or physician assistant it employs. Physician's supervisory duties shall be as set forth in Exhibit D and are subject to change as reasonably necessary.

(Ex. C).  The supervisory duties set forth in Exhibit D of the HMH Agreement mirror those described in Dr. Toelle's Collaborative Agreement with Vogel. (Id.; Ex. G; Toelle Dep. p. 258).  This Agreement was provided to Dr. Toelle and Vogel by HMH. (Dauby Dep. p. 344-45).

Although HMH admits that Dr. Toelle and Dr. Alvarez were "co-primary supervisors" of Atwell, HMH paid Dr. Toelle only $250 per month for her supervision of Atwell, and paid her nothing for supervising Vogel, although Vogel estimated Dr. Toelle was her supervisor 80 percent of the time, and Dr. Alvarez only 20 percent of the time. (Vogel Dep. p. 55; Dauby Dep. p. 360; Plaintiff's Answer to Counterclaim, ¶ 6) [Doc. 79]. HMH CEO Randall Dauby ("Dauby") reasoned that, because Dr. Toelle was receiving $500 per month for her duties as medical director pursuant to paragraph 5.6 of the HMH Agreement, then Dr. Alvarez would receive $500 per month for supervising Vogel, and both doctors would split $500 per month for their "co-supervision" of Atwell. (Toelle Dep. p. 109,113; Dauby Dep. p. 341, 344, 359-61). No record exists that HMH ever designated Dr. Alvarez as the only supervising physician for Vogel pursuant to the HMH Agreement, or that it ever designated Drs. Toelle and Alvarez as "co-primary supervisors."  However, it is undisputed that Dr. Toelle supervised both Atwell and Vogel. (Toelle Dep. p. 111-12; Alvarez Dep. p. 143).

Dr. Toelle did not agree with Dauby's reasoning and reminded him the HMH Agreement clearly stated the doctors should be paid $500 per month for each nurse practitioner they supervised in a primary supervision role. (Dauby Dep. p. 416; Toelle Dep. p. 109,133).   Dauby admits the HMH Agreement contains no provision allowing the pay of a primary supervisor to be "split" or reduced.   Nevertheless, HMH never amended the HMH Agreement to reflect how it actually paid Dr. Toelle, and it continued to pay her in this manner while she was employed. (Dauby Dep. p. 348, 378-79).

**2.     Dr. Toelle Solicits Employment with Deaconess**

  **a.     The 2011 Deaconess Residency Graduation Ceremony**

On June 24 2011, Dr. Toelle drove to Evansville to attend a graduation ceremony for Deaconess residents.   (Toelle Dep. p. 119).   Prior to the graduation ceremony, in late 2010/early 2011, Dr. Toelle began to entertain thoughts of not staying indefinitely at HMH. (Toelle Dep. p. 26).   Dr. Toelle was not invited to this ceremony by Deaconess. (Toelle Dep. p. 228-229).   Dr. Toelle had friends who were graduating from the program and she attended the ceremony at the "spur of the moment." (Toelle Dep. p. 119, 123).

At the ceremony, Dr. Toelle unexpectedly ran into Michelle Dexter, a Deaconess Physician Recruiter, and they had a "very brief" conversation, during which Dr. Toelle volunteered to Dexter she was unhappy at HMH and might be "contacting her down the line to inquire about" future employment. (Toelle Dep. 122-123, 229; Dexter Dep. p. 12-15, which is attached hereto as Exhibit H).   Dr. Toelle and Dexter agree this was the extent of their conversation that day.   (Id.).   Prior to this time, Deaconess was unaware Dr. Toelle was unhappy at HMH, and it did not contact her about employment. (Toelle Dep. p. 118-119).

**b.**   **Dr. Toelle Contacts Deaconess**

After the graduation ceremony, Deaconess did not contact Dr. Toelle regarding employment at Deaconess.  (Toelle Dep. p. 123; 230).  However, on September 20, 2011, Dexter received an email from Dr. Toelle stating, in pertinent part:

> I am contacting you to see if I can start looking into my options with Deaconess.  I am realizing more each day that I cannot continue my schedule and live a healthy way of life both mentally and physically.  I have some time coming up in October that I would be available during the week to meet.  Please let me know what you think.

(Ex. I; Toelle Dep. p. 123-124) (emphasis added).  At the time she sent this email, Dr. Toelle believed HMH was breaching the HMH Agreement in several respects, including failing to properly pay her for supervision of the nurse practitioners. (Toelle Dep. pp. 127-128).  Dr. Toelle knew she was not going to stay indefinitely at HMH and "just wanted to inquire" about employment opportunities at Deaconess. (Toelle Dep. p. 218).  Dr. Toelle testified as follows:

> I believed - - I thought that there was [sic] questionable issues with the contract at that time.  I also knew that I was not happy and did not want to stay and so I thought either way, if I stay or if I go, whatever time frame in these next two years, I know that I want to go back and work for Deaconess, so might as well start asking what is available.

(Toelle Dep. p. 131).

**c.**   **Dr. Toelle's October 17, 2011 Meeting at Deaconess**

In response to Dr. Toelle's unsolicited email, Dexter arranged meetings between Dr. Toelle and Deaconess representatives. (Dexter Dep. p. 43-44).  On October 17, 2011, Dr. Toelle traveled to Evansville, Indiana, and had separate meetings with (1) Dexter and Dr. David Christeson, the medical director of Deaconess Clinic (Basham Dep. p. 16, which is attached hereto as Exhibit J); (2) Charlene Basham, administrative director of the Deaconess hospitalist service ("Basham"); and (3) Dr. Matt Kolleck,

medical director of Deaconess Care Group. (Toelle Dep. p. 132-33; Basham Dep. p. 7, 9).

At her meeting with Dexter and Dr. Christeson, Dr. Toelle said she wanted to look into her options and "was exploring both outpatient and/or hospitalist work, if that was possible." (Toelle Dep. p. 133).  A hospitalist is a physician that provides medical care and support to patients admitted to the hospital, including but not limited to, coordinating care among medical specialists and facilitating communication among doctors and patients and their family.  (Ex. K).  At this meeting, Dr. Toelle volunteered she had a contract of employment at HMH for three years that contained a non-competition provision, the terms of which did not prohibit her from working for Deaconess.  (Toelle Dep. p. 29, 136, 224).

Deaconess first learned of the HMH Agreement on October 17, 2011. (Dexter Dep. p. 28).  Dr. Toelle did not volunteer, nor did Deaconess request, at any time, additional information about the HMH Agreement.  (Dexter Dep. p. 28).  Upon questioning by HMH's counsel, Dr. Toelle testified:

> Q.   [W]hen you told . . . [Deaconess] that you had a three-year contract with Hamilton, did anybody from Deaconess that you were talking to about that indicate that they had any concern about that . . . or were worried about, you know, the fact that you were contractually obligated to Hamilton?
>
> A.   <u>I prefaced that with the fact that I was unhappy and the reasons why and that I didn't feel like the contract was upheld, so I told them that I would be seeking legal advice and would let them know</u>.  And that was all - - .
>
> Q.   Legal advice to see if you could get out of the contract?
>
> A.   To see if the contract had been breached.
>
> *     *     *

Q.      And did anyone from Deaconess ask to see your contract?

A.      No.

Q.      Did you offer to show it to them?

A.      No.

Q.      And so you are telling them that you are going to check with your attorney to determine if, in fact . . . the agreement with Hamilton was breached by Hamilton, right?

A.      Yes.

Q.      And is that because you believe that if it had been breached by Hamilton, that you were then free to go work at Deaconess?

A.      Yes.

Q.      And so how did [Deaconess] respond to what you were saying about that, if they responded?

A.      <u>I mean [Deaconess] knew that there were no defined time lines. That we were just talking at that point and that was something that was brought up and that they would . . . hear back from me.</u>

(Toelle Dep. pp. 137-39; 142) (emphasis added).

During Dr. Toelle's brief meeting with Basham on October 17, 2011, Basham reviewed the standard compensation of a Deaconess hospitalist. (Basham Dep. p.18). Basham, who knew Dr. Toelle when she was a resident at Deaconess, testified about the meeting as follows:

Q:      What did she say she wanted to do at that point, if anything?

A:      She didn't tell me.

Q:      What did you understand was the purpose of her meeting with you?

A:      To explore options.

Q:      Options about coming to -- possibly coming to work for Deaconess?

A:      Possibly.

Q:      Alright.  In the hospitalist program?

A:      Yes.

                        *        *        *

Q:      Okay.  Did she give you any reasons why she wanted to come to
        work at Deaconess, what her thoughts were about that?

A:      No.

Q:      Did you ask her?

A:      No.

Q:      So all you did was tell her what the package would be - -

A:      Yes.

Q:      -- the standard package?  You can't recall her really saying much?

A:      No.

Q:      That was the end of the meeting?

A:      Pretty much.  Uh huh.

(Basham Dep. pp. 10, 18-19).

Dr. Toelle admits that after these meetings she did not inform Deaconess if or

when she would be available to work, and that "the ball was basically in [her] court."

(Toelle Dep. p. 133-34, 232).

    **c.**    **Dr. Toelle Pursues Hospitalist Position with Deaconess**

On December 13, 2011, Dr. Toelle emailed Basham to inquire about the

availability of a hospitalist position.   Dr. Toelle's email states, in pertinent part, as

follows:

> Just wanted to touch base with you and see if I was still a [sic]
> consideration for a hospitalist position.  I have my contract to my lawyer
> and he has emailed some comments.  We have plans to get together after
> the first of the year to go over more details.  <u>My timeline is still up in the air
> . . .</u>

(Ex. L) (emphasis added).

In response, Basham emailed Dr. Toelle informing her Deaconess had already made several recent offers, although there were still two positions available. (Ex. M). Dr. Toelle then informed Basham she was meeting with her attorney on January 6, 2012.  (Id.)  Basham "took comfort" in the fact Dr. Toelle had consulted with an attorney, and assumed Dr. Toelle would receive proper legal advice regarding the HMH Agreement.  (Basham Dep. p. 22, 26-27).

After consulting with her attorney to confirm that HMH had breached the HMH Agreement, Dr. Toelle decided to resign from HMH and pursue employment at Deaconess.  (Toelle Dep.p. 161).   On January 9, 2012, Dr. Toelle emailed Dexter stating, in pertinent part:

> I wanted to let you know that I met with my lawyer and plan to proceed with resigning from my contract in August this year.  I've given things a lot of thought and discussion and would like to pursue the hospitalist position at this time.

(Ex. N; Toelle Dep. pp. 143-44; 193; 232) (emphasis added).  Dr. Toelle also emailed Basham on January 9, informing her that she had met with her attorney and planned to resign from HMH.  (Ex. O).

On February 22, 2012, Dr. Toelle signed a Physician Employment Agreement with Deaconess (the "Deaconess Agreement) to begin work on October 1, 2012. (Toelle Dep. p. 161-162).  On June 1, 2012, Dr. Toelle tendered her written resignation to HMH, giving it three-month's notice. (Toelle Dep. p. 26; Dauby Dep. p. 21).  Dr. Toelle's last day of employment at HMH was September 1, 2012.  (Id.).

### 3.    The Deaconess Agreement

Unlike the HMH Agreement, the Deaconess Agreement provides, either party can terminate the agreement without cause with 120 days written notice.   It is Deaconess' experience this is a common provision in physician employment agreements. (Ex. P; Pile Dep. p. 53, 65, which is attached hereto as Exhibit Q).  Under the Deaconess Agreement, Dr. Toelle received a base salary of $240,000 for her first year, which includes pay for the shifts she works, an RVU rate, a quality bonus, and pay for mid-level supervision (Basham Dep. p. 59-60).   After the first year, there is no guaranteed salary and compensation is based on productivity.  (Basham Dep. p. 59; Toelle Dep. p. 14).  Dr. Toelle's compensation is typical for Deaconess hospitalists and is the same as that offered to other hospitalists. (Pile Dep. p. 97).

At Dr. Toelle's request, Deaconess paid her moving expenses of $4,446.48, a standard benefit also provided to Dr. Toelle by HMH.  (Ex. R; Toelle Dep. p. 8-10; Dauby Dep. p. 181).  Also, at Dr. Toelle's request, Deaconess paid her a $20,000 signing bonus, in the form of a forgivable loan.  This is a standard benefit also provided to Dr. Toelle by HMH.  (Toelle Dep. p. 5-8; Dauby Dep. p. 181).  In June 2012, after signing the Deaconess Agreement and giving notice to HMH, Dr. Toelle requested that Deaconess pay one-half of her sign-on bonus before she began work, which is also how HMH pays such bonuses.  (Dexter Dep. p. 63-64; Dauby Dep. p.270-71).

### 4.    Deaconess Recruiting Practice

Deaconess does not target individual physicians for employment.   Deaconess advertises available positions on various websites, and then responds to inquiries from physicians who are interested in working at Deaconess. (Dexter Dep. p. 83, 88-89; Pile Dep. p. 11-13).  If Deaconess contacts a physician, it is only in response to a physician,

who has already expressed interest in employment, using a database to which Deaconess subscribes. (Dexter Dep. p. 88-89, 91).

Deaconess does not have a formal policy to inquire, or not inquire, about an applicant's existing contractual obligations. (Pile Dep. p. 13).   However, Larry Pile ("Pile"), the Director of Human Resources at Deaconess from 2000 until June 2012, recalls giving general advice to Deaconess not to inquire about an applicant's existing contract, if any, because such a relationship is between those parties and not Deaconess.  (Pile Dep. p. 8-9, 15).  Pile explained that there were two reasons for his advice: (1) Deaconess could be asked by an applicant to provide legal advice as to the applicant's contract with another entity, and Deaconess does not want to assume that liability; and (2) most physician contracts have confidentiality clauses that prevent the physician from giving information about that contract, and Deaconess does not want to put those physicians in a position of violating the confidentiality clause of their contracts. (Pile Dep. p. 15,17). Even if an applicant gives unsolicited information about an existing contract, Pile's advice is the same. (Pile Dep. p. 19-20).

## ARGUMENT

Under Illinois law, a plaintiff must prove five elements to establish tortious interference with a contract:  (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) which caused a third party to breach the contract; and (5) damages. HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 676 (1989). Deaconess is entitled to summary judgment because HMH fails to establish several of these necessary elements.

1.  **The HMH Agreement Was Not Enforceable**

A claim for tortious interference with a contract requires, as its first element, a valid contract, and the lack of such a contract is fatal to a tortious interference claim. See Amendola v. Backer & Spielvogel, 1988 U.S. Dist. LEXIS 4790, *11-12 (N.D. Ill. 1988), attached hereto as Exhibit S; IK Corp. v. One Financial Place P'ship, 558 N.E.2d 161, 171-172 (Ill. App. Ct. 1990).  If the Court finds no valid contract, then it need not look further, and summary judgment is appropriate.  Auston v. Children's Memorial Med. Ctr., 1995 U.S. Dist. LEXIS 18918 at *30 (N.D. Ill. 1995), attached hereto as Exhibit T. In Amendola, the defendant conceded that the parties had an agreement, but argued it was unenforceable due to the statute of frauds. Id. at *12.  In response, the plaintiff argued the unenforceability of a contract because of a technical deficiency is not a defense.  Id.  The court granted summary judgment to defendants because "the requirement of a valid and enforceable contract is an absolute one."  Id.

The instant case presents much more than a technical deficiency in the HMH Agreement.  Despite admitting it designated Dr. Toelle as one of Atwell's primary supervisors, HMH repeatedly violated the HMH Agreement by failing to fully compensate Dr. Toelle for supervising Atwell, as well as Vogel. (Dauby Dep. p. 360; Plaintiff's Answer to Counterclaim, ¶ 6) [Doc. 79].  Although Dauby argued that HMH designated Dr. Alvarez as Vogel's only primary supervisor, there is no record of that fact.  Contrary to Dauby's self-serving testimony, the facts show HMH actually selected Dr. Toelle as one of Vogel's primary supervisors, just as it did with Atwell.  HMH made this selection by requiring Dr. Toelle and Vogel to sign the Collaborative Agreement, which was necessary so Vogel could work as a nurse practitioner under Dr. Toelle's supervision.

A non-breaching party can be excused from performing its obligations under a contract if a material breach of the contract has occurred.  Integrated Genomics, Inc. v. Nikos Kyrpides, 2010 U.S. Dist. LEXIS 6156, *32 (N.D. Ill. 2010) (citing Virendra S. Bisla, M.D., Ltd. v. Parvaiz, 884 N.E.2d 790, 795 (Ill. App. Ct. 2008), attached hereto as Exhibit U.  It is "axiomatic" that an employer's failure to timely pay an agreed upon wage is a material breach of contract.  Francorp. v. Siebert, 126 F.Supp.2d 543, 547 (N.D. Ill. 2000).  HMH failed to timely pay Dr.Toelle, and as result, the HMH Agreement was unenforceable well before Deaconess allegedly interfered with it.  Therefore, summary judgment in favor of Deaconess is appropriate.

**2.   Deaconess Did Not Unlawfully Induce or Cause Dr. Toelle to Allegedly Breach the HMH Agreement**

Deaconess is also entitled to summary judgment because HMH has not shown that Deaconess intentionally or unlawfully induced Dr. Toelle to resign from HMH, or caused her to breach the HMH Agreement.  Such inducement requires "some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way."  In re Estate of Albergo, 656 N.E.2d 97,103 (Ill. App. Ct. 1995)(emphasis added).

Proof of active participation requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another.  R.E. Davis Chemical Corp. v. Diasonics, Inc., 826 F.2d 678, 687 (7th Cir. 1987), modified on other grounds, 924 F.2d 709 (7th Cir. 1991).  The proof must also go beyond demonstrating that a defendant merely entered into an agreement with a third party with the knowledge that it could not perform both that agreement and its agreement with a plaintiff. In re Douglas Dunhill, Inc., 22 B.R. 953, 957 (Bankr. N.D. Ill. 1982).

In Chocolate Indus. v. Cornerstone Promotion, Inc., 2012 U.S. Dist. LEXIS 117033 at *7-12 (N.D. Ill. Aug. 20, 2012), attached hereto as Exhibit V, the plaintiff had an exclusive recording contract with the third-party band. Id. at *7.  The band made an unsolicited proposal to the defendant, which defendant accepted.  Id.  Although the band had previously taken actions inconsistent with its exclusive contract with plaintiff, for purposes of summary judgment, the court assumed that the exclusive contract was valid. Id.  The court granted summary judgment to defendant, relying heavily on the fact that the band, not the defendant, had initiated the discussions leading to its new contract with defendant. Id. at *7-13.  The court found that a party cannot be liable for tortious interference unless it is shown that that the defendant caused the interference. Id. at *11.  It was not enough that for the defendant to have reaped the advantages of a broken contract after the band had already withdrawn on its own accord.  Id.  "One does not induce another to commit a breach of contract with a third person…when he merely enters into an agreement with the other with knowledge that the other cannot perform it and his contract with the third person." Id. at *12.

The court in Chocolate relied on Sullivan's Wholesale Drug Comp., Inc. v. Faryl's Pharmacy, Inc., 573 N.E.2d 1370 (Ill. App. 1991).  Sullivan's had an exclusive contract to provide drugs to the residents of a nursing home.  Id. at 1372.  During contract renegotiations, the nursing home initiated contact with two other pharmacies: Faryl's and Enloe.  Id. at 1373-74.  After Sullivan's refused to sign a new contract, it sued Faryl's and Enloe for tortiously interfering with its business relationship with the nursing home.  Id. at 1374.

The court in Sullivan's affirmed summary judgment in favor of defendants because there was no evidence that either of them induced or caused the nursing home

to sever its business relationship with Sullivan's. Id. at 1375. The court acknowledged communications had occurred between the nursing home and the defendants, but found the fact the nursing home initiated communications with Faryl's and Enloe to be decisive. Id. The court also found that, although defendants agreed to take over the nursing home's business, there was no "authority which suggests that such an agreement, standing alone, is sufficient to constitute actionable inducement." Id.

In In re Douglas Dunhill, Inc, 22 B.R. 953, 954-55 (N.D. Ill. 1982), Dunhill agreed to lease a computer from the plaintiff, but later entered a lease agreement with the defendants. The court granted summary judgment to the defendants because plaintiff failed to show that they induced Dunhill to breach the agreement. Id. at 958. Instead, Dunhill was the party that solicited proposals from the defendants, who then responded to its requests. Id. at 957-58. In light of Dunhill's affirmative acts and its "predisposition to avoid" the contract, the court found that, even if the defendant knew of plaintiff's contract, the element of inducement was absent. Id. See also Medco Research, Inc. v. Fujisawa USA, Inc., 1995 U.S. Dist. LEXIS 1065 at p.*8 (N.D. Ill. Jan. 27, 1995) (defendant clearly could not have induced breach when third party approached defendant), attached hereto as Exhibit W; Farley v. The Kissell Co., 310 N.E.2d 385, 389-90 (Ill. App. 1974) (no unlawful inducement where sellers displayed a predisposition to avoid effects of contract).

As in the cases discussed above, Deaconess is entitled to summary judgment because the undisputed facts show it neither unlawfully induced Dr. Toelle to resign from HMH, nor caused her to allegedly breach the HMH Agreement. These undisputed facts include, but are not necessarily limited to, the following:

1.  Dr. Toelle had prior employment experience at Deaconess before going to HMH. (Toelle Dep. p. 19-20).

2.  Dr. Toelle, unilaterally and without solicitation, initiated contact with Deaconess to inquire about possible future employment opportunities, and in an exploratory meeting with Deaconess in October 2011, Deaconess responded to her expression of interest. (Toelle Dep. p. 122-23, 133, 229; Basham Dep. p. 18-19).

3.  Dr. Toelle thought of resigning from HMH in late 2012/early 2011.  Dr. Toelle then initiated contact with Deaconess because she was unhappy with HMH. (Toelle Dep. p. 26, 131).

4.  Deaconess did nothing to make Dr. Toelle unhappy with HMH.  And Deaconess did nothing to reinforce Dr. Toelle's discontent with HMH.  For example, Deaconess never made derogatory statements about HMH. Likewise, Deaconess never suggested or advised Dr. Toelle to leave HMH. (Toelle Dep. p. 238-239).

5.  Deaconess did not request a copy of the HMH Agreement. (Toelle Dep. p. 225).  Dr. Toelle did not show the HMH Agreement to Deaconess. (Toelle Dep. p. 138, 225).  Deaconess did not request to review the HMH Agreement. (Toelle Dep. p. 138; Dexter Dep. p. 58-59).  Deaconess did not question Dr. Toelle about the terms of the HMH Agreement. (Toelle Dep. p. 225).

6.  Deaconess never advised Dr. Toelle to seek legal advice about resigning from HMH.  Dr. Toelle made that decision herself prior to her October, 2011, exploratory meeting with Deaconess. (Toelle Dep. p. 138-39, 142, 231-32).

7.  At all times, Dr. Toelle set her own timeline regarding whether or not to resign from HMH and seek employment with Deaconess. (Toelle Dep. p. 137-39; 142).

8.  After meeting with Dr. Toelle in October 2011, Deaconess continued to seek applicants to fill the positions in which Dr. Toelle had expressed an interest. Deaconess did not hold any position open for Dr. Toelle until she notified it that, after consulting with her personal legal counsel, she was resigning from HMH to pursue a Deaconess hospitalist position.  (Ex. N, Ex. O).

The undisputed facts show Dr. Toelle was predisposed to resign from HMH well before she contacted Deaconess.  This predisposition had nothing to do with any alleged inducement by Deaconess, but was driven by what she perceived both as the breach by HMH of the HMH Agreement, and her overwhelming working conditions at

HMH.  The undisputed facts show that the determining factors for Dr. Toelle that lead her to resign from HMH and seek employment with Deaconess were: (1) the conduct of HMH, and (2) her attorney's opinion that she was able to resign from the HMH Agreement.  Once she received this legal advice, Dr. Toelle decided to pursue a specific employment opportunity with Deaconess, rather than simply discussing future options at Deaconess.  In short, Dr. Toelle resigned from HMH of her own accord without being unlawfully induced by Deaconess.

As in the cases discussed above, summary judgment is appropriate because Deaconess did not unlawfully induce Dr. Toelle to breach the HMH Agreement. Deaconess simply responded to Dr. Toelle's inquiries about employment; it did not target Dr. Toelle or pressure her to resign from HMH.  Inducement requires more than knowledge that one's conduct is substantially certain to result in a party breaking its contract with another.  R.E. Davis Chemical Corp., at 687.  Deaconess's knowledge did not approach even this threshold.  Deaconess was told the length of the HMH Agreement, but had no reason to be concerned about responding to Dr. Toelle's employment inquiries, or even extending an offer of employment to Dr. Toelle, particularly after she informed Deaconess that her noncompetition agreement with HMH did not prohibit her from working at Deaconess, and that she was consulting with legal counsel about her options.  Deaconess also had no reason to think the HMH Agreement did not contain an early termination provision.  Such a provision would allow Dr. Toelle to resign from HMH, and is a common provision in physician employment agreements. (Pile Dep. p. 53, 65).

HMH may argue that Deaconess financially induced Dr. Toelle to resign from HMH.  Any such argument should fail.  Deaconess offered Dr. Toelle the same

compensation package it offered other hospitalists it hired. (Pile Dep. p. 97).  Although

her first year hospitalist salary at Deaconess (guaranteed only for the first year) is

greater than her family practice base salary at HMH during the final year of the HMH

Agreement, HMH reluctantly admitted that Dr. Toelle could have earned <u>more</u> at HMH

than at Deaconess based on working additional emergency room shifts. (Dauby Dep. p.

182).  After Dr. Toelle's second year at Deaconess, her salary is based strictly on her

productivity.  At HMH, she earned a yearly salary without regard to her productivity.

Although Deaconess, at Dr. Toelle's request, also paid her a signing bonus, in the form

of a forgivable loan, as well as moving expenses, these are standard payments incurred

by hospitals when hiring new physicians.  HMH also routinely pays its physicians a

signing bonus and moving expenses. (Dauby Dep. p. 181, 270-71).

     Nothing in the record suggests Dr. Toelle was induced to leave HMH by any

compensation Deaconess paid to her.  On the contrary, the record is clear Dr. Toelle

was motivated to leave HMH because it breached the HMH Agreement, and because of

the working conditions created by HMH.  The undisputed facts show Dr. Toelle was

unhappy working at HMH in late 2010/early 2011, and that she had thoughts of

returning to Deaconess as early as June 2011.  Dr. Toelle's desire to leave HMH

occurred well <u>before</u> she was informed of Deaconess's standard hospitalist

compensation at a meeting on October 17, 2011.

<b><u>CONCLUSION</u></b>

     HMH cannot show that Deaconess unlawfully induced Dr. Toelle to resign from

HMH.  This is not a case where a predatory competitor lured a valued employee away

in order to steal trade secrets or customers.  Deaconess received an unsolicited request

for information about employment, responded to that request, and then hired Dr Toelle

after she informed Deaconess she was resigning from HMH, after receiving advice from legal counsel that she could do so.

Under these facts, Deaconess requests that the Court enter summary judgment in its favor on HMH's claim for tortious interference with the HMH Agreement, and that the Court grant all other proper relief.

Respectfully submitted,

KAHN, DEES, DONOVAN & KAHN, LLP

/s/ Jon Goldman
Jon Goldman
jgoldman@kddk.com

/s/ Mark A. McAnulty
Mark A. McAnulty, #6231114
mmcanulty@kddk.com

KAHN, DEES, DONOVAN & KAHN, LLP
501 Main Street, Suite 305
Post Office Box 3646
Evansville, IN  47735-3646
Telephone:  (812) 423-3183
Facsimile:  (812) 423-3841
Attorneys for Defendant, Deaconess Hospital, Inc.

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this 29th day of July, 2013, a copy of the foregoing Brief in Support of Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system.

A. Courtney Cox, Esq.
Sandberg, Phoenix & von Gontard, P.C.
ccox@sandbergphoenix.com

Thomas E. Berry, Jr., Esq.
Sandberg, Phoenix & von Gontard, P.C.
tberry@sandbergphoenix.com

Diane R. Poshard, Esq.
Sandberg, Phoenix & von Gontard, P.C.
dposhard@sandbergphoenix.com

Paul J. Wallace, Esq.
Jones • Wallace, LLC
pwallace@joneswallace.com

Robert W. Rock, Esq.
Jones • Wallace, LLC
rrock@joneswallace.com

/s/ Mark A. McAnulty
Mark A. McAnulty

*KDDK# 240514.2*

21