UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HAMILTON MEMORIAL HOSPITAL DISTRICT, an Illinois governmental municipality,<br><br>    Plaintiff/Counterdefendant,<br><br>              v.<br><br>APRIL TOELLE,<br><br>    Defendant/Counterclaimant,<br><br>and<br><br>DEACONESS HOSPITAL, INC.,<br><br>    Defendant. | No. 12-cv-1004-JPG-PMF |

## MEMORANDUM AND ORDER

This case began when defendant/counterclaimant April Toelle, a physician, stopped working for plaintiff/counterdefendant Hamilton Memorial Hospital District ("HMH") in the middle of a three-year contract term. Toelle left her employment with HMH mid-term and began working for defendant Deaconess Hospital, Inc. ("Deaconess"). HMH brings this suit for breach of contract against Toelle and for tortious interference with contract against Deaconess. Toelle brings a counterclaim against HMH for breach of contract and under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115 *et seq.*, for failing to pay her according to her contract. She believes HMH's failure to pay her properly excuses her failure to complete the contract term.

This matter comes before the Court on two motions for summary judgment:

- Toelle's motion for summary judgment (Doc. 69), to which HMH has responded (Doc. 87), to which Toelle has subsequently replied (Doc. 97); and

- Deaconess' motion for summary judgment (Doc. 80), to which HMH has responded (Doc.

97), to which Deaconess has subsequently replied (Doc. 103).

The Court also notes various evidentiary objections which had been filed as motions but which are more properly considered as part of the summary judgment briefing (Docs. 96, 98, 99, 104 & 110).

**I.     Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways. It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest

upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

**II.     Facts**

The evidence, taken in the light most favorable to the HMH where the parties disagree, establishes the following facts.[1]

    A.     <u>The Employment Agreement</u>

HMH owns and operates a hospital and an affiliated clinic in McLeansboro, Illinois. On December 4, 2009, HMH and Toelle, a physician, entered into the Physician Employment Agreement ("Agreement") pursuant to which Toelle agreed to work for HMH in the hospital and clinic from August 16, 2010, to August 15, 2013. The Agreement specifically provided:

---

[1]     The Court notes that HMH's responses are deficient in their citation to evidence in support of its positions. For example, there are instances where the brief makes factual assertions that are completely unsupported by the exhibits cited to support them or where the brief cites pages of depositions that are not included in the attached exhibits. HMH attempts to remedy some of these deficiencies in subsequent filings related to motions to strike, but submission of evidence that late in the game is unfair because it does not give the other parties an opportunity to respond. Therefore, in setting forth the facts of this case, the Court declines to credit the insufficiently supported "facts."

    Toelle further objects to the relevance of other evidence cited by HMH in its response. The Court includes facts established by some of this evidence in order to tell a complete story but, as explained later in this order, does not rely on those facts in making its decision. Other evidence is irrelevant even for the purposes of telling a complete story, so the Court omits facts established by that evidence.

    To the extent the parties' briefings actually constitute sur-reply or subsequent briefs relating to the substance of the summary judgment motions, the Court has disregarded them. Local Rule 7.1(c) provides, "Under no circumstances will sur-reply briefs be accepted."

> **Extent of Service.**   Physician is hereby employed full-time by Hospital and shall devote whatever time and efforts may be required for the performance of Physician's duties and as more fully described in the Job Description attached as Exhibit F.   During the term of this Agreement, Physician shall not, except as otherwise expressly authorized by Hospital in writing, undertake any professional obligations of any kind or nature including, but not limited to, administrative and executive obligations, other than teaching and writing on Physician's own time.   Physician agrees to notify Hospital if at any time Physician cannot fulfill Physician's obligation to fulfill Physician's duties in accordance with the terms of this Agreement.

Agreement § 2.6.   The Agreement defines "Physician" as Toelle.   *Id.* at § 1.4.

The Agreement contained several provisions for potential compensation above Toelle's base pay.   For example, the following provision covers potential compensation for supervising midlevel practitioners, that is, nurse practitioners and physician assistants:

> **Supervisor.**   Physician shall be paid $500 per month for each nurse practitioner or physician assistant supervised by Physician in a primary supervision role.   Supervision shall include both quality and quantity of the nurse practitioner's or physician assistant's work.   During any vacancy when there is no nurse practitioner or physician assistant to supervise, this compensation will not be paid.   Hospital has the final decision as to which physician is the supervising physician for each nurse practitioner or physician assistant it employs.   Physician's supervisory duties shall be as set forth in Exhibit D and are subject to change as reasonably necessary.

*Id.* at § 5.5.   Exhibit D defined the "Duties as Supervisor":

> Participates in joint formulation and approval of orders or guidelines with the nurse practitioner or physician assistant
>
> Periodically reviews orders and the services provided patients under orders in accordance with accepted standards of medical practice and advanced practice nursing practice
>
> Meets in person with the nurse practitioner or physician assistant to provide collaboration and consultation
>
> Is available through telecommunications for consultation on medical problems, complications or emergencies or patient referral

> Reviews medical records of midlevel providers in accordance with Hospital guidelines and guidelines for rural health clinics

*Id.*, Ex. D.

The Agreement also contained the following provision covering potential compensation for serving as medical director of the clinic:

> **Medical Director**.   Physician shall be paid $500 per month to fulfill the duties and responsibilities of Medical Director of the Rural Health Clinic should the Hospital determine the need to do so.   Final determination of which physician is the Medical Director is that of the Hospital.   Physician's duties as Medical Director shall be as set forth in Exhibit E and are subject to change as may be reasonably necessary.

*Id.* at § 5.6.   No provision of the Agreement states that one physician cannot serve both as a nurse practitioner primary supervisor and as medical director.

The Agreement also provided for potential "Incentive Compensation" beyond Toelle's base pay depending on her performance.   The incentive compensation had two parts:   an "Efficiency Bonus" and an "Incentive Bonus."   The incentive bonus is based on the weighted value of certain billed procedures.   *Id.*, Ex. B.

The Agreement also contained an integration clause:

> **Entire Agreement.** This Agreement supersedes all previous contracts or agreements between the parties with respect to the same subject matter and does constitute the entire Agreement between the parties hereto and neither Hospital nor Physician shall be entitled to benefits other than those herein specifically enumerated.

*Id.* at § 13.3.   Amendments to the Agreement could only be made by a writing signed by HMH and Toelle.   *Id.* at § 13.8.

HMH believes the negotiating history is important to understand the Agreement.   In July 2009, prior to executing the Agreement, HMH's chief executive officer, Randy Dauby, gave

Toelle a compensation schedule that listed $6,000 ($500 per month) as the annual compensation for the "Mid-Level Supervisor or Director." Later, in November 2009, Dauby communicated with Toelle and Alex Alvarez, another doctor HMH was hiring at the same time it hired Toelle. He indicated to Toelle that the supervisor and medical director responsibilities referred to in the Agreement would be divided between Toelle and Alvarez and that either Toelle or Alvarez would serve as the medical director and the other would serve as the nurse practitioner supervisor but that they could rotate these duties if they wanted to. As noted above, this understanding of the division of labor was not memorialized in the Agreement. Toelle and Dauby, on behalf of HMH, signed the Agreement on December 4, 2009.

  B. <u>Toelle's Employment With HMH</u>

When Toelle began working for HMH in August 2010, she served as the medical director and held that position until she left HMH on or around September 1, 2012. She was compensated $500 per month for that work. At the time she began, there were no nurse practitioners working for HMH. The following year, in August 2011, HMH hired two nurse practitioners, Tara Vogel and Sharon Atwell.

Vogel worked in the HMH clinic. At that time Dauby decided Alvarez would be Vogel's supervisor pursuant to his pre-Agreement discussions with Alvarez and Toelle, and HMH began paying Alvarez $500 per month ostensibly pursuant to § 5.5 of the Agreement. Dauby never informed Toelle after she signed the Agreement that HMH had designated Alvarez as Vogel's primary supervisor, and, in practice, Toelle and Alvarez both supervised Vogel. For example, Toelle reviewed Vogel's medical charts, but Alvarez signed off on those charts. In addition, in September 2011, HMH had Toelle and Vogel sign a "collaboration agreement" regarding their working relationship. A collaboration agreement between a nurse practitioner and a supervising

physician is required by state law before a nurse practitioner can practice in a rural health clinic and was therefore necessary before Vogel could work as a nurse practitioner in HMH's clinic. Consistent with this agreement, Toelle supervised Vogel approximately 80% of the time.

Atwell worked in the HMH emergency room, where both Toelle and Alvarez provided supervision. Toelle provided approximately 50% of Atwell's supervision.

Shortly after Atwell was hired, Toelle asked HMH's chief financial officer Kent Mitchell why she was not being paid for supervising Atwell and Vogel. In response to Toelle's inquiry, Dauby decided to split the $500 supervisor pay for supervising Atwell equally between Toelle and Alvarez. Accordingly, HMH paid Toelle $250 per month until she left HMH. Dauby maintained that Alvarez was Vogel's primary supervisor and did not agree to compensate Toelle for the supervision she provided to Vogel.

In addition, Toelle never received an incentive bonus, and Dauby never followed through on a promise to adjust the bonus program to compensate her.

C.  Toelle's Departure from HMH

Well before her three-year employment term expired, Toelle became dissatisfied with her job at HMH. A few months after she began working for HMH, before the nurse practitioner supervision payments and incentive compensation payments became an issue, she began contemplating employment elsewhere.

In June 2011, after running into a Deaconess physician recruiter, Michelle Dexter, at a Deaconess resident graduation ceremony for some friends, she first considered leaving HMH specifically to work for Deaconess, where she had worked for a number of years during her medical education. At the ceremony, she told Dexter she was unhappy working at HMH and might be seeking employment at Deaconess sometime in the future. From then on, whenever

Toelle talked with Deaconess personnel, they made her feel like she would be welcome back at Deaconess.

Toelle and Deaconess did not have any further contact until September 2011, when Toelle contacted Dexter again and said she was starting to look into her options for employment after she stopped working for HMH. Dexter arranged for Toelle to meet with several Deaconess doctors and administrators to discuss employment at that hospital. Dexter suggested Toelle update her resume before the meetings and made efforts to find out exactly what types of positions Toelle might be interested in.

During meetings on October 17, 2011, Toelle disclosed that she had a three-year contract with HMH that included a covenant not to compete but that the covenant would not prevent her from working at Deaconess. She also indicated she was seeking legal advice about whether she was still bound by the Agreement in light of HMH's performance of the Agreement. She believed at the time – but did not inform Deaconess – that if HMH had not breached the Agreement, she would be available to Deaconess in the fall of 2013, but that if HMH had breached the Agreement, she would be available in the fall of 2012. The Deaconess representatives told Toelle what the standard terms of Deaconess physician employment were. They did not ask about the specific terms of Toelle's contract with HMH other than the non-compete clause and did not encourage her to stay with HMH or to leave HMH before the Agreement allowed. At the end of the meeting it was understood that Toelle would let Deaconess know if and when she wanted to pursue her employment options with Deaconess further.

In December 2011, Toelle contacted Deaconess to see if employment was still an option. At that point she informed Dexter why she was uncertain as to whether she would be available in the fall of 2012 or 2013 and indicated she was meeting with her attorney soon to discuss the issue.

Deaconess responded that there were still positions available. She also told another Deaconess administrator that her timeline was still undecided but that she was meeting with her attorney soon to nail down an availability date. The administrator responded that she would love to have Toelle work for Deaconess again and was anxious to hear what Toelle's attorney would say.

The following month, after meeting with her attorney, Toelle informed Dexter she had consulted her lawyer and was ready to resign from HMH and pursue employment with Deaconess. In February 2012, Toelle asked if she could sign a letter of intent then and wait to sign the Deaconess contract until after she had notified HMH she would be leaving, but Deaconess said it needed a signed contract as soon as possible to assure Toelle would actually come to Deaconess. Several days later, Toelle signed a contract to begin working for Deaconess in October 1, 2012. That contract provided for more compensation than the Agreement but did not contain any terms that were out of the ordinary for that type of hospital-physician employment contract. At Toelle's request, Deaconess agreed to keep her decision confidential until after she gave notice to HMH.

In March 2012, Toelle met with Dauby. When Dauby asked if she was planning on renewing the Agreement at its expiration, she said she did not know. She did not mention her newly signed contract with Deaconess or her plans to leave HMH later in the year. Instead, Toelle testified that they discussed her dissatisfaction with nurse practitioner supervision payments and other practices at the HMH clinic. Dauby maintains that Toelle did not complain about the nurse practitioner payments at this meeting.

On June 1, 2012, Toelle notified Dauby she would be resigning on September 1, 2012. Toelle stayed with HMH through August 31, 2012, and then left to work at Deaconess beginning October 1, 2012.

D.  This Lawsuit

HMH filed this lawsuit on September 14, 2012, alleging that Toelle breached the Agreement by leaving HMH and working for Deaconess without HMH's permission before the end of the Agreement term. HMH also alleges that Deaconess tortiously interfered with the Agreement by continuing to offer Toelle employment while she was contractually obligated to work for HMH. On April 2, 2013, Toelle filed a counterclaim asserting that HMH breached the Agreement by failing to fully compensate her for supervising the Vogel and Atwell, failing to provide incentive compensation, and changing the terms and conditions of her employment after she signed the Agreement. She claims HMH's conduct also violates the IWPCA.

**III.  Analysis**

A.  Toelle's Motion for Summary Judgment

Toelle asks the Court to grant summary judgment on her counterclaim on the grounds that there is no genuine issue of material fact that HMH owes her compensation under the Agreement for serving as the primary supervisor for Vogel and Atwell for thirteen months and for incentive compensation. She further believes these breaches of the Agreement justify her leaving her employment and becoming employed by Deaconess before the end of the Agreement's term. On this basis, she asks for summary judgment on HMH's breach of contract claim as well.

HMH argues that prior to execution of the Agreement, HMH, Toelle and Alvarez understood that Toelle would serve as the medical director of the clinic, Alvarez would supervise the nurse practitioners, and neither would perform both functions but could alternate functions if they desired. These understandings, HMH argues, show that it did not breach the Agreement by failing to pay Toelle $500 per months for supervising Vogel and $500 per month for supervising Atwell.

This dispute presents a contract interpretation question governed by Illinois law.  *See* Agreement § 13.5.  Under Illinois law, when construing a contract the Court must give effect to the intent of the parties.  *Schek v. Chicago Transit Auth.*, 247 N.E.2d 886, 888 (Ill. 1969).  The Court must first attempt to determine this intent solely from the contract language.  *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (citing *Western Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 287 (Ill. 1962)); *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984).  It is the Court's duty to construe and enforce the contract as it was written.  *Shaffer v. Liberty Life Assur. Co. of Boston*, 746 N.E.2d 285, 288 (Ill. App. Ct. 2001).  If the language is unambiguous, the Court must interpret the contract as a matter of law without reference to extrinsic evidence, also called parol evidence.  *Air Safety*, 706 N.E.2d at 884.  A party's particular interpretation of the terms at the time is immaterial where the terms of the contract are clear.  *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 892 (7th Cir. 2004).  On the other hand, if the language is susceptible to more than one meaning, then the contract is ambiguous and parol evidence may be used to determine the parties' intent.  *Air Safety*, 706 N.E.2d at 884.

There is an exception to this general rule where the language of a contract is unambiguous on its face but the context of the contract reveals that the language may not mean what it seems to mean on its face – a so-called "extrinsic ambiguity."  Extrinsic ambiguities may be explored by parol evidence.  *Air Safety*, 706 N.E.2d at 885 (citing *Ahsan v. Eagle, Inc.*, 678 N.E.2d 1238, 1241 (Ill. App. Ct. 1997)).  However, the exception does not apply where, as here, the parties' contract contains an integration clause stating that the written agreement is the entire agreement.  *Air Safety*, 706 N.E.2d at 885.  "[C]onsidering extrinsic evidence of prior negotiations to create an 'extrinsic ambiguity' where *both* parties *explicitly* agree that such evidence will *not* be considered ignores the express intentions of the parties and renders integration clauses null."  *Air Safety*, 706

N.E.2d at 885.

Here, the Agreement contains an integration clause at § 13.3. Therefore, if the Agreement is clear on its face, the Court will not consider parol evidence such as the negotiation of the Agreement or other events leading up to its execution to determine what the Agreement means.

The Agreement is clear on its face as to HMH's obligation to pay Toelle for supervising nurse practitioners. First, the agreement defines the term "Physician" to be Toelle. Therefore, the Court can substitute "Toelle" for each occurrence of the term "Physician" without changing the meaning of the Agreement. For clarity, the Court also substitutes "HMH" for "Hospital" or "the Hospital." With these substitutions, § 5.5 of the Agreement reads, in pertinent part, "Toelle shall be paid $500 per month for each nurse practitioner or physician assistant supervised by Toelle in a primary supervision role. . . . HMH has the final decision as to which physician is the supervising physician for each nurse practitioner or physician assistant it employs." The Agreement also provides in § 5.6, in pertinent part, "Toelle shall be paid $500 per month to fulfill the duties and responsibilities of Medical Director of the Rural Health Clinic should HMH determine the need to do so. Final determination of which physician is the Medical Director is that of HMH." The Agreement does not state that if it selects Toelle as the medical director she cannot also serve as the primary supervisor for a nurse practitioner. This restriction HMH urges the Court to read into the Agreement is unsupported by the text of the Agreement, which is otherwise clear: HMH has the right to select who will supervise each nurse practitioner, and the primary supervising physician will be paid $500 per month for providing that primary supervision.

       1.    <u>Supervision of Vogel</u>

As for Vogel, the undisputed evidence shows that Toelle supervised Vogel in a "primary supervision role." HMH impliedly, although not expressly, appointed and approved Toelle as a

supervisor for Vogel. After the Agreement was signed – surpassing all prior agreements, as provided by the integration clause – HMH never informed Toelle or Vogel that Alvarez was Vogel's supervisor or that Toelle was *not* Vogel's supervisor. Instead, it required Toelle and Vogel to enter into a collaboration agreement that provided Toelle would provide the supervision outlined in Exhibit D of the Agreement, clearly a step indicating Toelle's designation as Vogel's supervisor, or at least one of them. In fact, Toelle actually provided 80% of that supervision, certainly sufficient to establish her as Vogel's "primary" supervisor since Alvarez provided, at the most, only 20% of Vogel's supervision. Given these facts, the Court believes no reasonable jury could find that Toelle was not serving in a "primary supervision role" relating to Vogel. Thus, she was entitled to $500 per month pursuant to § 5.5 of the Agreement for each month she did not waive the right to such payment.

HMH has not waived the affirmative defense of waiver by failing to plead it in its answer to Toelle's counterclaim. Federal Rule of Civil Procedure 12(h)(2) provides that defenses other than those enumerated in Rule 12(b) may be raised as late as trial and are not waived if not raised in a responsive pleading.

To the extent HMH believes Toelle has waived her claim by continuing to perform the Agreement for a year after the breach, that theory will not negate the entirety of Toelle's claim.[2] It is true that generally a party to a contract may waive a breach of that contract by its conduct after the other party has breached it. *Asset Recovery Contracting, LLC v. Walsh Constr. Co. of Ill,* 980 N.E.2d 708, 727 (Ill. App. Ct. 2012), *app. denied*, 982 N.E.2d 767 (Ill. 2013); *Caisse Nationale de*

---

[2] The parties have not addressed the question of whether an employee may waive provisions of the IWPCA in light of the public policy in favor of making such rights non-waivable. *See O'Brien v. Encotech Constr. Servs., Inc.*, 183 F. Supp. 2d 1047, 1049-52 (N.D. Ill. 2002). The Court declines to decide this issue without briefing from the parties.

*Credit Agricole v. CBI Indus. Inc.,* 90 F.3d 1264, 1275 (7th Cir. 1996). A party should not be allowed to lull another party into believing it will not demand strict performance of a contractual duty and then sue it for breach of that duty. *Asset Recovery*, 980 N.E.2d at 727. A waiver may occur, for example, by the failure to object, *C-B Realty & Trading Corp. v. Chicago & N.W. Ry. Co.*, 682 N.E.2d 1136, 1142 (Ill. App. Ct. 1997), or by continued performance under the contract, *Business Dev. Servs., Inc. v. Field Container Corp.*, 422 N.E.2d 86, 92 (Ill. App. Ct. 1981). The critical question in deciding whether a waiver has occurred is whether the party who fails to object to the breach or continues with performance of the contract intended to relinquish the right to demand performance of the breached contract term. *See Caisse Nationale*, 90 F.3d at 1275; *Business Dev. Servs.*, 682 N.E.2d at 1142. Whether a party waived a contractual provision is a question of law, but whether the facts exist in a particular case to support a waiver finding is a question for the jury. *Business Dev. Servs.*, 422 N.E.2d at 92.

There is a genuine issue of material fact about whether or how often Toelle objected to the failure to pay her $500 for supervising Vogel. There is also a genuine issue of material fact regarding whether Toelle, by continuing to perform the contract for an additional year after not receiving payments for being Vogel's primary supervisor, intended to relinquish her right to that compensation.

Additionally, the Agreement itself provides that "[t]he waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, nor be construed to be, a waiver of any subsequent breach thereof." Agreement § 13.4. Thus, even if Toelle waived any part of her counterclaim by continuing to perform her obligations under the Agreement without objection after she learned she was not being paid properly, she may not have waived all of her counterclaim.

Considering the surrounding circumstances, there is a genuine issue of material fact regarding whether Toelle waived her right to some or all of the compensation due her under the Agreement for serving as Vogel's primary supervisor. Therefore, Toelle is entitled to summary judgment on the issue of whether she earned payment under § 5.5 of the Agreement for her supervision of Vogel but is not entitled to summary judgment on the question of whether she has waived the right to any or all of that payment.

        2.        <u>Supervision of Atwell</u>

With respect to Atwell, there are genuine issues of material fact regarding whether Toelle served in a "primary supervision role." HMH admits she supervised Atwell, and the evidence shows she served as a supervisor for 50% of the time, with Alvarez providing as much as 50% of the supervision as well. Based on the evidence in the file, a reasonable jury could find either that she or Alvarez was Atwell's primary supervisor. In any case, the Agreement makes no provision for payment of $250 per month for sharing supervision duties with another physician, and the parties did not amend the Agreement in writing. Thus, Toelle is either entitled to $500 per month as Atwell's primary supervisor or nothing for the supervision she provided Atwell. Additionally, for the reasons discussed above, a reasonable jury could also find she waived her entitlement to some or all of any payments due to her for supervising Atwell. For these reasons, she is not entitled to summary judgment based on unpaid compensation for supervising Atwell.

        3.        <u>Other Claimed Breaches</u>

Other than the alleged breaches addressed above, Toelle has not carried her summary judgment burden of showing she is entitled to judgment as a matter of law. Other than general assertions that she is owed unpaid incentive compensation, she has not presented evidence establishing any actual failure to pay amounts due under the Agreement. As for her allegation

that HMH breached other duties it owed her under the Agreement by changing the terms and conditions of her employment, she has not pointed to what those duties were or to evidence of how they were breached.  She is not entitled to summary judgment on these theories.

For the foregoing reasons, Toelle is entitled to summary judgment on one issue:  she earned the right to receive $500 per month under § 5.5 of the Agreement for supervising Vogel. All other issues, including but not limited to whether facts exist to support a waiver of that right for any time period and the specific amounts she is due, if any, under the IWPCA, remain for trial.

### 5. Defense to HMH's Breach of Contract Claim

Toelle asks the Court to grant her summary judgment on HMH's breach of contract and IWPCA claim on the defense of prior breach.  It is true that a material breach of a contract provision will justify non-performance by the other party to the contract.  *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 976 N.E.2d 1014, 1025 (Ill. App. Ct. 2012), *app. denied*, 982 N.E.2d 769 (Ill. 2013).  However, the breach must be material, and whether a breach is material

> is a complicated question of fact involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.

*William Blair & Co., LLC v. FI Liquidation Corp.,* 830 N.E.2d 760, 779 (Ill. App. Ct. 2005) (internal quotations omitted).

The evidence in this case does not compel a finding that any breach for failure to pay compensation for serving as the primary supervisors of nurse practitioners, or any of the other breaches alleged by Toelle, constituted a material breach that would justify Toelle's failure to perform the Agreement through its entire term.  As explained above, it is unclear whether HMH

16

breached the agreement as to Atwell or whether Toelle waived any claim for breach relating to Vogel or Atwell or whether HMH breached any incentive compensation or other provision in the Agreement. Additionally, the compensation due under § 5.5 of the Agreement is relatively small compared to the overall value of the Agreement, but there is no evidence as to its significance in the parties' bargain or as to the custom and usage of such terms in physician employment contracts. Finally, the supervision Toelle provided allowed HMH's nurse practitioners to practice and earn money for HMH at a time when medical professionals in rural areas are in short supply, so it would be unfair not to compensate Toelle when she facilitated this earning opportunity for HMH. For these reasons, the Court believes there is a genuine issue of material fact regarding whether any breach of § 5.5 of the Agreement was material so as to justify Toelle's failure to perform the Agreement through its termination date.

B.  Deaconess' Motion for Summary Judgment

Deaconess asks the Court to grant summary judgment on HMH's claim for tortious interference with contract on the grounds that there is no evidence it interfered with the Agreement in any improper way. HMH argues there is evidence from which a reasonable jury could find Deaconess unduly encouraged her to breach the Agreement.

Under Illinois law, which both parties assume applies to this cause of action, to prevail on a tortious interference with contract claim, a plaintiff must prove:

> (1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages.

*Seip v. Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 638 (Ill. App. Ct. 2011). Deaconess believes HMH cannot prove the first, third and fourth elements.

1.  Valid, Enforceable Agreement

Deaconess argues that the Agreement was not enforceable because of one of the alleged material prior breaches Toelle describes in her summary judgment motion – non-payment or underpayment of nurse practitioner supervision compensation.  For the same reasons the Court found a genuine issue of material fact about whether HMH's conduct justified Toelle's leaving HMH's employment before the Agreement's term ended, it also finds a genuine issue of material fact regarding whether the Agreement is enforceable in the context of HMH's tortious interference with contract claim.

2.  Intentional, Unjustified Inducement; Causation of Breach

Deaconess argues that its interactions with Toelle prior to her leaving HMH's employment were not sufficient to qualify as improper inducement, and that its conduct did not cause Toelle to leave HMH in violation of the Agreement, although it benefited from her decision to do so.  HMH disagrees, pointing to positive statements Deaconess made to Toelle leading up to the execution of her contract with Deaconess.

To satisfy the requirements of a tortious interference with contract claim, the inducement must be "active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way."  *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. App. Ct. 1995) (internal quotations omitted).  Further, the defendant must have actively intended to induce a breach.  *R.E. Davis Chem. Corp. v. Diasonics, Inc.,* 826 F.2d 678, 686 (7th Cir. 1987).

A close examination of the interactions between Deaconess and Toelle leading up to her departure from HMH does not reveal the kind of intentional, unjustified inducement required to prove intentional interference with contract.  It is undisputed that Deaconess had the intent to hire Toelle, but what is forbidden is not the intent *to hire* but the intent *to induce a breach*.  No

evidence suggests Deaconess intended to hire Toelle before she was free of the Agreement with HMH.  When she was under contract with HMH, Deaconess did nothing more than be nice to Toelle, respond to her inquiries about potential employment, and make her a good job offer that would begin when she stated she was available to work.   When Deaconess representatives learned Toelle was unhappy at HMH, they said she was welcome to come back to Deaconess and expended some effort in talking with her about positions in which she might be interested and the standard compensation package.   They did not do anything in expressing that welcome that a reasonable jury could construe as active persuasion to breach the Agreement.   They made clear that when she was available, they would be happy to have her back, and they relied on Toelle to inform them when that would be.   Indeed, at each step of the negotiation, they left the ball in Toelle's court to contact them again, and only hired Toelle when she assured them she was available to work.   The law did not require Deaconess to investigate whether Toelle's conduct would violate the Agreement or to second-guess Toelle's counseled judgment about when she could begin working for Deaconess.[3]

Because no reasonable jury could conclude that Deaconess improperly induced Toelle to violate the Agreement, Deaconess is entitled to summary judgment on HMH's tortious interference with contract claim.

## IV. Conclusion

For the foregoing reasons, the Court:

- **GRANTS in part** and **DENIES in part** Toelle's motion for summary judgment (Doc. 69). The motion is **GRANTED** to the extent it seeks summary judgment on the issue of

---

[3]  HMH has alleged that, sometime before the graduation ceremony in June 2011 where Toelle ran into Dexter, a Deaconess administrator encouraged Toelle to return to Deaconess.   The Court has disregarded this allegation as unsupported.   However, even if the Court were to consider the administrator's statements, they amount to nothing more than an indication that Deaconess would be interested in hiring Toelle again in the future, not an incitement to violate her existing employment contract.

    whether she earned payment under § 5.5 of the Agreement for her supervision of Vogel. The motion is **DENIED** in all other respects;

- **GRANTS** Deaconess' motion for summary judgment (Doc. 80); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

Deaconess is terminated as a party in this case.

**IT IS SO ORDERED.**
**DATED: April 7, 2014**

                                         s/J. Phil Gilbert
                                         **J. PHIL GILBERT**
                                         **DISTRICT JUDGE**